# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| ANGELA M. SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:17CV2398 RLW |
| ) | |
| NANCY BERRYHILL, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Court reverses the decision of the Commissioner and remands for further review.

## I. Procedural History

Plaintiff protectively filed an application for DIB on May 15, 2014. (Tr. 14, 137-38) Plaintiff alleged disability beginning April 28, 2014 due to seizures, carpal tunnel syndrome, deteriorating back disc, and migraines. (Tr. 75, 137) Plaintiff's claim was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 72, 75-80, 82) On May 2, 2016, Plaintiff testified at a hearing before the ALJ. (Tr. 31-61) In a decision dated June 28, 2016, the ALJ determined that Plaintiff had not been under a disability from April 28, 2014 through the date of the decision. (Tr. 14-25) On July 14, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the May 2, 2016 hearing, Plaintiff appeared with counsel. Plaintiff's counsel stated that Plaintiff retired early from her job as a data entry clerk because she had difficulty dealing with migraines and seizures. She also had problems with her hands due to carpal tunnel syndrome, her back, and her knees. Plaintiff used a walker, and her leg was propped up during the hearing. Counsel further stated that Plaintiff had memory problems which would limit her to simple, repetitive work. (Tr. 33-36)

Counsel questioned Plaintiff about her impairments and how those caused Plaintiff to retire early. Plaintiff testified that she would key in payments but then her hands would get stuck so that she could no longer key. Plaintiff would also forget verbal instructions from her boss. In addition, Plaintiff had problems sitting up straight due to deteriorating disc disease. Plaintiff saw an orthopedist, who gave Plaintiff's shots every two to three months. However, Plaintiff could not afford the shots, and her new insurance did not cover them. With respect to her migraines, Plaintiff needed to lie down in a dark room for 30-45 minutes when she felt a migraine starting. If she did not notice the migraine in time, she would spend two to three days vomiting in a dark room. Plaintiff experienced migraines three or four times per month. Plaintiff stated that she had to leave work or call in sick because of her migraines; however, the migraines had improved since she stopped working. According to Plaintiff, her boss suggested she retire early because she was missing too many work days. Plaintiff further testified about her seizures, which she experienced one to three times in a month. After a seizure, Plaintiff felt very sick with migraines and vomiting. She was shaky and barely able to walk. (Tr. 38-44)

Plaintiff stated that the speed with which she was able to key information decreased because of her hands. In addition, she was unable to lift a basket of clothes or open a bottle or

2

jar. She had surgery on her thumbs, which did not help with her carpal tunnel syndrome. Plaintiff also experienced numbness and tingling in her fingers. Towards the end of her employment, Plaintiff was unable to post all her payments, and someone else helped her finish. Since she stopped working, Plaintiff's back pain stayed the same. She was unable to stand for very long. She started using a walker after she broke her ankle. Plaintiff testified that she could only sit in a chair without her leg propped up for about 30 minutes. Then her back would start hurting, she would walk around, then sit back down. Plaintiff propped up her leg at the hearing because her leg hurt. She also experienced swelling in her ankle. She elevated and iced her ankle every night. Plaintiff further testified that she could stand 15 to 30 minutes before needing to sit down. She could walk 10 minutes without her walker but then she would need to sit down due to back pain. Plaintiff used her walker because it took pressure off her foot. Plaintiff stated that her nerves also affected her ability to work. She was very rushed and nervous at work, and her boss was intimidating. Plaintiff also had difficulty concentrating and remembering things. (Tr. 44-52)

A vocational expert ("VE") testified at the hearing regarding Plaintiff's past relevant work. Plaintiff worked as a data entry clerk, which was sedentary and semiskilled. The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience. The person was limited to sedentary work and could lift, carry push, or pull 10 pounds occasionally and less than 10 pounds frequently. The individual could sit for 6 hours in an 8 hour workday; stand and/or walk for 2 hours in an 8 hour workday, but for no more than 15 minutes at a time; never climb ropes, ladders or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; have no exposure to unprotected heights or hazardous machinery; and have only occasional exposure to respiratory irritants such as dust, fumes, odors,

3

gases, and poor ventilation. Given this hypothetical, the VE testified that the person could perform Plaintiff's past work. The ALJ then added the limitation of simple, routine, and repetitive tasks. Given this limitation, the VE testified the person could not perform Plaintiff's past work. (Tr. 53-55)

Plaintiff's attorney also questioned the VE, who testified that Plaintiff's past work required frequent reaching, frequent handling, and constant fingering. Further the data entry position accepted only one absence per month. The ALJ then held the record open for one day to allow counsel to submit additional records. (Tr. 55-61)

In a Function Report – Adult dated August 6, 2014 Plaintiff stated that she could not focus on work or remember simple tasks. She had severe headaches, and her back pain prevented her from sitting or walking very long. Her seizures, respiratory infections, wrist surgeries, and anxiety medication prevented her from properly performing her job. During the day, Plaintiff slowly cleaned the house, watched TV, and did laundry. She was able to care for her dog. Plaintiff's pain woke her up at night. She could cook meals daily and could clean the house once every three weeks. However, she would become dizzy and her spine would hurt, causing her to sit down. Plaintiff needed help with vacuuming and doing laundry. Plaintiff was able to shop for groceries, but she did not shop very often. Plaintiff mainly watched TV every day. However, she could not tolerate the TV noise or light during a migraine. Plaintiff spent time with her sister and son, going shopping or out to eat. Plaintiff needed reminders to go places and needed someone to accompany her. She had no problems getting along with others. She stated that her impairments affected her ability to lift, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. Plaintiff opined that she could lift 5 pounds and walk a quarter block before taking a 10

4

to 15 minute break. She followed written instructions okay but had problems following spoken instructions. Plaintiff did not handle stress well. (Tr. 170-77)

### III. Medical Evidence

Plaintiff was treated for seizures, back pain, and migraines by John J. O'Keefe, M.D., a neurologist. On March 14, 2013, Dr. O'Keefe noted that he had first diagnosed Plaintiff with seizure disorder 16 years ago. Plaintiff reported that she had not experienced a seizure for 14 years. She further stated that she was able to do activities of daily living without limitations and able to work without limitations. Plaintiff complained of low back pain which had been a persistent problem for 10 years. She also reported migraines which last occurred 8 months ago. (Tr. 457-60)

On April 30, 2014, Plaintiff presented to the emergency room for complaints of acute onset of dizziness, nausea, and vomiting for the last 3 days, with a severe headache. The examining physician believed Plaintiff's migraine resulted from a breakthrough seizure because she was off her medications. Plaintiff had another seizure, which was witnessed in the ER. A CT scan, MRI, and EGG/EMG tests were all normal. Plaintiff was also diagnosed with a urinary tract infection ("UTI"), and it was noted that she experienced recurrent UTIs. Plaintiff's discharge diagnoses included migraine headaches with severe nausea and vomiting; breakthrough seizures due to inability to take seizure medications; UTI; and high narcotic tolerance. Secondary diagnosis included depression. She was released to home on May 3, 2014 with medications including Topamax and Dilantin and was instructed not to drive or work with heavy machinery. (Tr. 349-82)

Plaintiff again presented to the ER on May 27, 2014 for complaints of dizziness and headache. Tests revealed metabolic acidosis from Topamax, which was discontinued. Plaintiff

5

was discharged in stable condition on May 28, 2014. She was told to continue Dilantin and diagnosed with atypical migraines; complex partial seizures with secondary generalization; metabolic acidosis secondary to Topamax; dizziness from acidosis; and acute sinusitis. (Tr. 383-409)

On June 13, 2014, Plaintiff told Dr. O'Keefe that her migraines began 16 years ago and that the episodes occurred 3 times a week and lasted for 4 hours. An EEG, SER of the right median were normal. An EMG of both upper extremities showed evidence of denervation in the right triceps muscle. Nerve conduction studies were consistent with bilateral carpal tunnel syndrome. Dr. O'Keefe prescribed medication and instructed Plaintiff not to operate a motor vehicle unless she has been seizure free for at least 6 months. (Tr. 1332-37)

On May 4, 2016, Dr. O'Keefe again evaluated Plaintiff for seizure disorder and migraine headache. Plaintiff reported that she had good symptom control with opioid analgesics. Examination of the cervical and lumbosacral spine showed some moderate tenderness and spasm. Functional testing of the wrist was positive for Tinel's Sign. Dr. O'Keefe planned to review all medications. He continued Plaintiff's Dilantin for partial epilepsy and Butorphanol Tartrate for migraines. (Tr. 1351-56)

On that same date, Dr. O'Keefe completed a Headaches/Seizure Residual Functional Capacity Questionnaire. Dr. O'Keefe stated that he had been Plaintiff's neurologist since 1997 and saw Plaintiff every 6 months. Plaintiff's diagnosis was intractable migraine with aura. She experienced headaches which were preceded by a visual aura, accompanied by nausea, photophobia, and vomiting. The migraines worsened with activity. Dr. O'Keefe reported that Plaintiff experienced these headaches 3 days a week, 4 hours in duration. The migraines were triggered by stress and weather changes, and became worse with bright lights, movement, and

6

noise. Nasal spray improved the headaches. Dr. O'Keefe opined that emotional factors did not contribute to the severity of Plaintiff's headaches. Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the form. Plaintiff obtained relief from the nasal spray with no side effects. Dr. O'Keefe further opined that Plaintiff would be precluded from performing basic work activities when she had a headache. She would need to take unscheduled breaks for 3 days each week and rest for 4 hours before returning to work. Additionally, Dr. O'Keefe found that Plaintiff was capable of tolerating high stress work, noting that she had worked as a bill collector for decades. He further opined that Plaintiff would have more than 4 absences per month. Dr. O'Keefe noted that Plaintiff had seizures with a loss of consciousness. The dates of Plaintiff's last three seizures were 1997, December 1999, and August 2015. Plaintiff was compliant with taking medication. (Tr. 1344-50)

In May, 2016, Dr. O'Keefe clarified that the EMG testing in December 2014 was of the lower extremities and that physical exam showing Tinel's Sign positive bilaterally was a way to detect irritated nerves and was common in patients with carpal tunnel syndrome. (Tr. 219-21)

Plaintiff was also treated for dysuria from 2012 to 2015 by Felix E. Herrera, M.D., Fareesa Khan, M.D., Aamina B. Akhtar, M.D. Plaintiff complained of painful urination and UTIs. A cystoscopy performed on June 23, 2014 was normal. Plaintiff was prescribed antibiotics and vaginal cream. On April 1, 2015, Dr. Khan noted that Plaintiff had only 2-3 UTIs in the past year. (Tr. 247-92, 419-88)

Plaintiff further complained of low back pain and bilateral leg pain. On April 4, 2014, Ashok Kumar, M.D., noted diffuse tenderness bilaterally at the L4-L5/L5-S1 region. Lumbar motion was limited and straight leg raising bothered Plaintiff more on the right than the left. Dr. Kumar assessed radiculitis, thoracic or lumbar; spinal stenosis of the lumbar region; and

7

degeneration of lumbar or lumbosacral intervertebral disc. Dr. Kumar performed epidural injections and advised Plaintiff to continue her exercise program. (Tr. 295-304) On June 25, 2015, Dr. Herrera noted that Plaintiff took Hydrocodone, Methocarbamal, and Sulindac for pain. Plaintiff denied chronic back pain or pulled muscle during an earlier visit. (Tr. 1293-1301)

In addition, Plaintiff was treated for COPD. On June 3, 2015, Plaintiff underwent pulmonary function testing. Gary F. Marklin, M.D., assessed mild bronchial airflow obstruction, markedly decreased diffusing capacity, even when corrected. Plaintiff was given an inhaler to use on an as-needed basis. (Tr. 603-16, 1293)

Plaintiff presented to the ER on August 9, 2015 with an ankle fracture after falling down some stairs. Plaintiff was admitted to the hospital and underwent an open reduction internal fixation. Discharge notes indicate that she had a seizure postoperatively and that her Dilantin was low. Plaintiff was also treated for a UTI. On August 14, Plaintiff was released to nursing facility for further therapy with diagnoses of right trimalleolar fracture and status post open reduction internal fixation; seizure disorder with one occurrence with hospitalization and resolved with antiepileptic drug adjustment; anemia; UTI and antibiotics, complete; and COPD, stable. (Tr. 617-1115)

Plaintiff was admitted to a nursing facility for physical therapy. Plaintiff left the facility and received home care services through October 6, 2015. (Tr. 1116-1218) On November 30, 2015, Plaintiff was evaluated by Arnold Physical Therapy. She complained of right ankle stiffness and pain. She also experienced numbness and tingling, as well as pain limiting her ability to ambulate. The therapist recommended physical therapy 3 times a week for 4 weeks. On December 2, 2015, Plaintiff was advised to increase activity and functional activities. 582-85)

8

Plaintiff also complained of psychological impairments. On September 28, 2015, Dr. Herrera performed a depression screening. Plaintiff reported feeling down, depressed, or hopeless and feeling bad about herself as a failure more than half the days over the past 2 weeks. She also reported having trouble concentrating. Dr. Herrera assessed mild depression. (Tr. 1284-92) On March 17, 2016, Dr. Herrera assessed depression, major, recurrent, mild. He continued Fluoxetine and advised Plaintiff to be around people who lifted her spirits; avoid people that made her feel depressed; and minimize stress by exercising, staying active, and filling her mind with pleasantries. (Tr. 1275-83) A psychological assessment by Robert Cottone, Ph.D. on September 8, 2014 found Plaintiff's depression to be non-severe. (Tr. 66)

### IV. The ALJ's Determination

In the decision dated June 28, 2016, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2017. She had not engaged in substantial gainful activity since her alleged onset date of April 28, 2014. The ALJ found that Plaintiff had severe impairment including degenerative disc disease (DDD); obesity; migraines; epilepsy; varicose veins; dysuria; COPD; status post fracture of the right ankle with open reduction internal fixation (ORIF); polyneuropathy; and carpal tunnel syndrome (CTS). The ALJ determined that Plaintiff's impairment of dysthymic disorder was not severe. Further, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-19)

After careful consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work in that she can lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently. She could sit for 6

hours in an 8-hour workday; stand and walk for 2 hours in an 8-hour workday, but for no more than 15 minutes at a time; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could have no exposure to unprotected heights or hazardous machinery; and could have only occasional exposure to respiratory irritants. The ALJ determined that Plaintiff was capable of performing past relevant work as a data entry clerk, as the work did not require the performance of work-related activities precluded by Plaintiff's RFC. Therefore, the ALJ concluded that Plaintiff had not been under a disability from April 28, 2014 through the date of the decision. (Tr. 19-25)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient

10

evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her brief in support of the Complaint, Plaintiff raises three arguments. First, Plaintiff asserts that substantial evidence does not support the RFC finding because the ALJ failed to consider the impact of all of Plaintiff's severe impairments. Second, Plaintiff argues that the ALJ erred in giving little weight to the medical opinion of Dr. O'Keefe. Finally, Plaintiff contends that the RFC lacked evidentiary support and explanation. Defendant responds that the ALJ properly evaluated the record, including Plaintiff's subjective complaints and the medical opinion evidence. Defendant further asserts that the ALJ properly formulated Plaintiff's RFC and properly found Plaintiff was not disabled. Upon thorough review of the parties' briefs and the entire record, the Court finds that the ALJ did not properly assess Plaintiff's RFC such that the case should be remanded for further review.

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Residual Functional Capacity is a medical question, and the ALJ's assessment must be supported by substantial evidence. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Sieveking v. Astrue*, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008) (quoting SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996)). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Tinervia v. Astrue*, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); *see also Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . . ."). In

13

addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). The ALJ may not rely upon his or her own inferences. *Id.* at 858.

Here, Plaintiff correctly notes that, in making the RFC determination, the ALJ failed to support her findings with specific medical evidence. The RFC finding sets forth an ability to perform sedentary work with additional limitations. (Tr. 19) However, the opinion contains no discussion of how the medical evidence supports Plaintiff's capacity for sedentary work level, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

Other than Dr. O'Keefe's opinion, which the ALJ gave little weight, none of the physicians addressed Plaintiff's ability to function in the workplace. Indeed, the ALJ acknowledged that the record contained no other medical opinions. (Tr. 24) Dr. O'Keefe opined that Plaintiff would need to take unscheduled breaks for 3 days each week and rest for 4 hours before returning to work would be absent from work 4 days per month. (Tr. 1347-48) While Dr. O'Keefe addressed Plaintiff's migraines and seizures with respect to her ability to work, none of Plaintiff's other treating physicians addressed her functional abilities in light of the other impairments which the ALJ found to be severe, namely degenerative disc disease (DDD); obesity; varicose veins; dysuria; COPD; status post fracture of the right ankle with open reduction internal fixation (ORIF); polyneuropathy; and carpal tunnel syndrome (CTS).

14

Indeed, the ALJ points to no medical evidence in the record demonstrating Plaintiff's ability to function in the workplace. Instead, the ALJ draws upon his own inferences from the medical evidence in finding that Plaintiff could perform sedentary work with additional limitations. "Unless the inferences are supported by opinions from treating or consultative experts, they do not constitute substantial evidence." *Hess v. Colvin*, No. 4:14CV1593 CDP, 2015 WL 5568056, at *11 (E.D. Mo. Sept. 22, 2015) (citation omitted); *see also Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) (finding that the law forbids the ALJ from "playing doctor"). In evaluating Plaintiff's RFC, the ALJ "was required to consider at least some supporting evidence from a medical professional." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).

Because the ALJ's RFC determination is not supported by substantial evidence, the Court will remand the case to the ALJ for further review. The decision is unclear as to what medical evidence supports the ALJ's determination that Plaintiff had the RFC to perform sedentary work. Further, the record is vague as to Plaintiff's ability to perform her past relevant work as a data entry clerk. Specifically, the VE testified that the job of data entry clerk required frequent reaching, frequent handling, and constant fingering. (Tr. 55) The Court notes that the ALJ found Plaintiff's carpal tunnel syndrome to be severe, yet nothing in the record addresses Plaintiff's ability to reach, handle, and finger as required by a data entry clerk position. Therefore, on remand, the ALJ shall support the RFC determination with medical evidence that addresses the Plaintiff's ability to function in the workplace. To the extent that the record is insufficient, the ALJ should re-contact the examining physicians or order further consultative examinations that specifically address Plaintiff's RFC. Further, the ALJ may want to seek clarification from the VE regarding Plaintiff's ability to perform her past relevant work.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. An appropriate Order of Remand shall accompany this Memorandum and Order.

Dated this 25th day of September, 2018.

*Ronnie L. White*
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**